3:23-mj-00028

DISTRICT OF OREGON: ss,                               AFFIDAVIT OF CLAY OTHIC

### Affidavit in Support of a Criminal Complaint

I, Clay Othic, being first duly sworn, hereby depose and state as follows:

### Introduction and Agent Background

1.  I am a Special Agent (SA) with Homeland Security Investigations (HSI) and have been so employed since 2003. I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) and I am authorized by law to conduct investigations and to make arrests for felony offenses. I am currently assigned to the Assistant Special Agent in Charge, Portland, Oregon. Prior to this, I was employed as a U.S. Border Patrol Agent and have been a federal law enforcement officer since September 1996. I am authorized and assigned to investigate violations of federal laws, including 21 U.S.C. §§ 841(a)(1), 846, 848, and 843(b) of the Drug Abuse Prevention and Control Act of 1970; that is, possession with intent to distribute and the distribution of controlled substances, conspiracy to commit such offenses, the operation of a continuing criminal enterprise, and the use of a communication facility to facilitate a felony violation of the Drug Abuse Prevention and Control Act of 1970. During my tenure as a federal law enforcement officer, I have investigated and/or participated in investigations of conspiracy, money laundering, narcotics trafficking, fraud, smuggling and theft. I have also acquired knowledge and information about the illegal drug trade and the various means and methods by which it is furthered including through the use of computers, smart phones, digital media and the Internet from formal and informal training, other law enforcement officers and investigators, informants, individuals I have arrested and/or interviewed, and from my participation in other investigations. I am currently detailed to the High Intensity Drug

Trafficking Area (HIDTA) Interdiction Taskforce (HIT) located at the Portland Police Bureau's (PPB) Narcotics and Organized Crime Division (NOC).

2.  This affidavit is based upon a joint investigation, conducted by the HIDTA Interdiction Task Force (HIT), Portland Police Bureau (PPB), and Homeland Security Investigations (HSI).

### Purpose of Affidavit

3.  This affidavit is submitted to support a criminal complaint and arrest warrant for Yexon Efrain MENDEZ-Zuniga, AKA: Edicxon Adrian Zuniga, Edixon Mendes-Zuniga, Edixon Mendez, Yexon Mendes-Zuniga, a Hispanic male, date of birth xx/xx/2003 (hereinafter referenced as "MENDEZ"), for committing the crimes of Possession with the Intent to Distribute a Controlled Substance (Fentanyl), in violation of Title 21, United States Code, Section 841(a)(1); Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of Title 18, United States Code, Section 924(c); and, being an Alien Illegally and Unlawfully in the United States, Unlawfully Possess a Firearm, in violation of Title 18, United States Code, Section 922(g)(5)(A).

4.  I have obtained the facts set forth in this affidavit through my personal participation in the investigation described below; from oral and written reports of other law enforcement officers; and, from records, documents and other evidence obtained during this investigation. I have obtained and read official reports prepared by law enforcement officers participating in this investigation and in other related investigations.

### Summary of Probable Cause

5.  On February 22, 2023, PPB officers were conducting surveillance in areas of downtown Portland, Oregon where numerous open-air drug transactions have been observed and reported.

6. At approximately 10:49 AM, PPB Officer Arnold observed MENDEZ at the intersection of SW 4th Avenue and SW Washington Street, in Portland, Oregon, briefly meet with an individual and conduct a suspected hand-to-hand drug transaction. Shortly thereafter, at approximately 10:59 AM Officer Arnold observed MENDEZ at the intersection of SW 4th Avenue and SW Harvey Milk Street conduct what appeared to be multiple hand-to-hand transactions. Officer Arnold was able to record video of MENDEZ with his cellular phone as MENDEZ made several suspected drug sales to multiple individuals. During the recording, Officer Arnold observed what appeared to be a block of powdered fentanyl in MENDEZ's hand which he would break off chunks for buyers. Additionally, Officer Arnold observed MENDEZ using a handheld radio, appearing to communicate with other accomplices in the area.

7. Officer Arnold notified other PPB Officers of his observations, provided a description and picture of MENDEZ, and stated he had probable cause for an arrest.

8. Shortly thereafter, Officers Honl and Green located and positively identified MENDEZ near Director's Park at SW Yamhill Street and SW Park Avenue, Portland, Oregon. Officer Green activated his police lights on his marked PPB car and directed MENDEZ to stop. Once Officer Green exited his patrol car MENDEZ immediately ran from the officers. Officer Green pursued MENDEZ for approximately two (2) blocks before MENDEZ became tired and stopped. At this point, Officers Green and Perry took MENDEZ into custody without incident.

9. Officer Green began searching MENDEZ incident to arrest and found two clear baggies in MENDEZ's front hooded sweatshirt pocket. The first bag contained an estimated 250 plus blue M30 pills and the second bag held a chunk of suspected powder fentanyl. While being searched MENDEZ repeatedly kept saying "armas." Upon realizing this word was Spanish for "weapon or gun" Officer Green pulled up MENDEZ's sweatshirt and discovered a black handgun

tucked into MENDEZ's waistband. Officer Honl retrieved the firearm and noted it was a Century Arms 9mm pistol, which held a loaded magazine containing seventeen (17) rounds. Additionally, Officer Green located a large fold of US currency in MENDEZ's right jacket pocket and Officer Honl located additional cash in the left jacket pocket of various denominations. Lastly, Officer Green found a cell phone and handheld radio in MENDEZ's right pants pocket.

10.  Following the arrest Officer Hutchinson was given a magazine by a citizen who had seen MENDEZ throw down while running from the officers. The magazine contained sixteen (16) rounds of 9mm ammunition and was consistent to the one found in the pistol.

11.  Officers transported MENDEZ and the evidence to Central Precinct for processing. Officer Arnold fingerprinted MENDEZ and submitted his fingerprints for comparison in law enforcement databases with negative results.

12.  Officer Honl field tested the blue M30 pills and suspected powder fentanyl with both substances being positive for the controlled substance fentanyl, a Schedule II controlled substance.

13.  During interactions with the Officers, MENDEZ indicated he only spoke Spanish. At Central Precinct, Officer Kirby-Glatkowski (an intermediate Spanish speaker) provided MENDEZ his *Miranda* rights in the Spanish language, to which MENDEZ acknowledged he understood his rights, and agreed to waive his rights and be interviewed by officers.

14.  During the interview MENDEZ told Officer Kirby-Glatkowski he began dealing drugs seven (7) days ago to earn more money than his previous job as a roofer. MENDEZ states he would meet with an individual by the name of "Dylan" each morning at 10:00 AM at SW 4th Avenue and SW Washington Street and buy 300 blue M30 pills for $1.00 each. MENDEZ admitted to selling the pills for $2.00 each to random people on the street who approached him.

MENDEZ stated he knew the blue pills he was distributing were drugs containing fentanyl, calling them by their street names "blues" and "Freddy."

15.     MENDEZ stated he continued this pattern for the past seven (7) days in which he sold the drugs in various parts of downtown Portland, including Director's Park where he was arrested. MENDEZ said he would usually sell out of his daily 300 pills around 6:00 PM.

16.     Further, MENDEZ stated that on the morning of his arrest, he obtained powdered fentanyl from "Dylan" and that he sold it on the street for $5.00 to $10.00 depending on the size of the pinch the customer wanted.

17.     In total, based upon his statements, I estimate MENDEZ sold approximately 1,800-2,100 M30 pills and an unknown quantity of fentanyl powder over the past week.

18.     Additionally, MENDEZ stated that he was given the handgun that was found in his waistband during his arrest by an associate of "Dylan" who goes by the moniker "El Gato." MENDEZ stated he was given the gun for his protection because he needed to protect himself, his supply of drugs, and the proceeds he made from selling the drugs. MENDEZ further stated he did not plan to hurt anyone, but only wanted the gun to defend himself if someone attempted to rob or assault him because of his drug dealing activities. Furthermore, MENDEZ stated he had not paid for the handgun and "El Gato" fronted it to him but expected a payment of $150.00 in the future.

19.     I know from my training and experience that drug dealing is a dangerous business and drug traffickers regularly possess guns in furtherance of their drug trafficking activities for the following reasons: First, an accessible gun provides defense against anyone who may attempt to rob the trafficker/buyer of his drugs or drug profits; Second, possessing a gun, and letting everyone know that you are armed, lessens the chances that a robbery will even be attempted; Third, having a gun accessible during a transaction provides protection in case a drug deal turns sour; Fourth, the

visible presence of a gun during the transaction may prevent the deal from turning sour in the first place; and, Fifth, having a gun may allow the drug trafficker to defend the "turf" area from which lower-level dealers operate for the trafficker.

20. During the interview MENDEZ admitted he was using a handheld radio to communicate with "Dylan." Shortly before MENDEZ's arrest, he was observed talking on this radio. When Officer Kirby-Glatkowski asked about the use of the radio MENDEZ admitted he was using it to talk to "Dylan" regarding the deals that were being conducted, the amount of money being made, and when MENDEZ would be paying "Dylan."

21. Following the interview by Officer Kirby-Glatkowski, MENDEZ was reinterviewed by HSI Special Agents Clay Othic and David Slafsky. MENDEZ was again provided his *Miranda* rights in Spanish by SA Othic. MENDEZ stated he understood his rights and was willing to waive these rights and talk to SAs Othic and Slafsky. Additionally, MENDEZ signed ICE Form 75-025, Statement of Rights acknowledging the same. Furthermore, MENDEZ was read a Consent to Search Cellular/Tablet Device form by SA Othic which he also acknowledged and signed.

22. During the interview with SAs Othic and Slafsky, MENDEZ stated that he was a native and citizen of Honduras who was illegally present in the United States. MENDEZ stated he entered the United States without permission at or near Nogales, Arizona on or about May of 2021 at a location other than a United States Port of Entry. SA Othic conducted a search of immigration systems and could not find any records that MENDEZ was legally present in the United States.

23. Immediately following the interview by SAs Othic and Slafsky, Officer Kirby-Glatkowski and HSI Task force Officer (TFO) Castaneda reinterviewed MENDEZ. TFO Castaneda is a native Spanish speaker and reiterated the information previously provided to

Officer Kirby-Glatkowski by MENDEZ. TFO Castaneda confirmed the accuracy of MENDEZ's previous statements and asked if MENDEZ would be willing to cooperate in approaching "Dylan" or order more drugs to which MENDEZ declined.

24. At this time TFO Castaneda also confirmed that MENDEZ had previously lied to the arresting Officers and SA Othic regarding his identity, utilizing the alias of Edixon Mendez-Zuniga. Based on this new information SA Othic conducted an additional search of law enforcement and immigration databases with negative results.

25. Through my training and experience, and conversations with other law enforcement officers, I know that it is common for firearms to be sold by a wholesale business in one state for distribution in another state. For this reason, purchasers of firearms often obtain firearms that originated in another state. I examined the firearm seized from MENDEZ and observed that it was stamped with the manufacturer name "Century Arms Inc Georgia, VT" and the model was a " CANiK TP9v2," serial number T6472-16 AT 01385. I conducted an internet search and learned that the Century Arms Inc CANiK is a firearms manufacturer based in Georgia, Vermont and that the firearm traveled in interstate commerce prior to being found in Oregon. No official ATF nexus report has yet been completed.

26. In total, MENDEZ was found to possess 269 counterfeit M30 pills that weighted approximately 27 grams.  The powdered fentanyl seized from MENDEZ weighed approximately 11.2 grams.

27. I know that drug traffickers are increasingly selling counterfeit M30 prescription pills that are manufactured with fentanyl, a Schedule II controlled substance.  These counterfeit pills are designed to replicate real 30 mg Oxycodone pills, which are round, blue in color, and stamped with an "M" and "30" on them. Drug dealers regularly counterfeit these pills and, while

attempting to replicate the round shape, the blue color, and the stamp of "M" and "30," they are instead manufacturing these pills with fentanyl as the active ingredient. The counterfeit pills, while looking roughly similar to the real thing can sometimes be distinguished based upon their appearance. The counterfeit M30 pills often have a different shade of blue than the real thing and sometimes they are even manufactured in different colors, the edges of the pills and the stamped impressions are often rough and lack the precision of a real 30 mg Oxycodone pill, and sometimes the counterfeit pills will crumble easily under pressure. I have seen and seized hundreds of thousands of these counterfeit M30 pills and, of the samples submitted for forensic analysis, lab reports have always confirmed the presence of fentanyl within them. I also know it has become common knowledge in the drug trafficking community that these pills contain fentanyl. I know a user amount of a counterfeit M30 pill is often one pill at a time, which can either be ingested or burned and inhaled. Depending on the level of addiction, some addicts will use between 5 to 15, or more pills in a day. These pills can sell on the street to a user for between $2 to $10, or more. I know that the possession of more than 100 of these counterfeit M30 pills is indicative of possession for purposes of further distribution.

### Conclusion

28.     Based on the foregoing, I have probable cause to believe, and I do believe, that Yexon Efrain MENDEZ-Zuniga has committed the crimes of Possession with the Intent to Distribute a Controlled Substance (Fentanyl), in violation of Title 21, United States Code, Section 841(a)(1); Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of Title 18, United States Code, Section 924(c); and, being an Alien Unlawfully and Illegally in the United States, Unlawfully Possess a Firearm, in violation of Title 18, United States Code, Section

///

922(g)(5)(A). I therefore request that the Court issue a criminal complaint and arrest warrant for Yexon MENDEZ-Zuniga.

29.   Prior to being submitted to the Court, this affidavit, the accompanying complaint, and the arrest warrant were all reviewed by Assistant United States Attorney Scott Kerin.  AUSA Kerin advised me that in his opinion the affidavit and complaint are legally and factually sufficient to establish probable cause to support the issuance of the requested criminal complaint and arrest warrant.

*By phone pursuant to Fed R. Crim. P. 4.1*
Clay Othic / Special Agent
Homeland Security Investigations

Subscribed and sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at  9:10 am   on February   23   , 2023.

_____
HONORABLE JOLIE A. RUSSO
UNITED STATES MAGISTRATE JUDGE